IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

RONALD J. T,[1]

   Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

   Defendant.

Civil No. 17-cv-844-CJP[2]

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits In August 2013, alleging disability beginning on May 11, 2013. After holding an evidentiary hearing, ALJ Christina Young Mein denied the application in a written decision dated June 28, 2016. (Tr. 10-21). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

---

[1] In keeping with the court's recently adopted practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 22.

Plaintiff raises the following points:

1. The ALJ failed to comply with 20 C.F.R. § 404.1527 by failing to accord adequate weight to the opinion of the claimant's treating physicians, Drs. Farmer and Sensintaffar.

2. The ALJ committed reversible error in failing to recontact the claimant's treating medical provider as required by 20 C.F.R. § 404.1512(e).

## **Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience

has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must

determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

ALJ Mein followed the five-step analytical framework described above. She determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. The alleged onset date was the day after a previous application for benefits had been denied. He was insured for DIB through December 31, 2015. She found that plaintiff had severe impairments of obesity; degenerative joint disease of the right knee; status post left rotator cuff repair; carpal tunnel syndrome; L5 root dysfunction with radiculopathy; and essential

4

tremors. These impairments did not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform sedentary work with no working of foot controls; no walking 50 feet on uneven surfaces without a cane; no climbing ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, and fingering; no crouching, crawling, or overhead work; occasional exposure to extreme cold, unprotected heights, and hazardous machinery; and only simple, routine, and repetitive tasks.

Based on the testimony of a vocational expert, the ALJ found that plaintiff could not do his past relevant work, but he was not disabled because he was able to do other jobs which exist in significant numbers in the local and national economies.

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

1. **Agency Forms**

A prior application had been denied on May 10, 2013. (Tr. 71).

Plaintiff was born in 1970 and was almost 43 years old on the alleged onset date. (Tr. 232). He said he stopped working in December 2010 because of his conditions. He had worked as a delivery driver and a sanitation driver. (Tr. 236-237).

In October 2013, plaintiff submitted a report stating that he was unable to work because he had trouble walking and climbing up and down stairs. He had severe back and leg pain. He could not pass a physical exam for employment. He had trouble concentrating and staying awake. He had tremors, hearing problems, arthritis, depression, and nerve damage. He did some household chores, some cleaning, used a riding mower, and did limited household repairs. (Tr. 255-262).

2.   **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in March 2016. (Tr. 36).

Plaintiff was 5'10" tall and weighed 270 pounds. He lived with his wife and 15 year-old son. He was on a motorized cart, which he used for long distances. For walking shorter distances, he used a cane. Neither one had been prescribed by a doctor, but a doctor "recommended" the cane. He had been covered by Medicaid since 2011. (Tr. 39-41).

Plaintiff was terminated from his job as a sanitation driver for the city of Belleville, Illinois, in 2009 or 2010 because he lost his "emotion" and got out of control. He was being harassed because he was too slow on the job. He had "an outburst." He last looked for work in 2013. (Tr. 42-43).

Plaintiff said he was unable to work because he had "arthritis really bad." He had pain in his knees, shoulders, hip, back, and hands. He had tremors and his hands shook uncontrollably. He had depression and posttraumatic stress syndrome. He also had diabetes and sleep apnea. (Tr. 44-45).

Plaintiff testified that his knees swelled at least 2 or 3 times a week. When

that happened, he sat in the recliner with his legs propped up and put ice packs on his knees. His doctor recommended shots for his knees, but insurance would not authorize that. (Tr. 53). The tremors in his hands occurred randomly. (Tr. 55). He had "nerve pain" in his back that contributed to his left knee problem. He got shooting pain like an electric shot in his back. When that happened, he could not do anything but take pain medication and sit in his chair. (Tr. 57-58).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment. The VE testified that this person could not do plaintiff's past work, but could do other jobs that exist ion significant numbers in the national economy. (Tr. 65-66).

### 3. Medical Treatment

In October 2011, Dr. Burger, a neurologist, diagnosed essential tremor and prescribed propranolol. (Tr. 382-382). In July 2013, plaintiff told Dr. Burger he had been denied social security disability benefits because of the extent of his tremors and the effective suppression of tremors with medication. He complained of lumbar pain radiating into his left leg and knee, and bilateral thumb pain and numbness. He had prior carpal tunnel surgery. On exam, he had normal strength, tone and bulk throughout. He had a fine action tremor with sustained posture and fine articulate activity in both upper extremities. Vibration sense was diminished in a stocking distribution, but pinprick, light touch, and proprioception were preserved. The range of motion of the back was diminished. Dr. Burger ordered testing and physical therapy. (Tr. 379-380).

EMG and nerve conduction studies were done on the upper and lower

extremities in July 2013. They showed bilateral median nerve entrapment neuropathy at the wrists, and possible bilateral L5 radiculopathy. The report states that the overall EMG exam "is suboptimal as patient was complaining of a lot of pain and noted have somewhat poor efforts."  (Tr. 384-385).

An MRI of the lumbar spine done in July 2013 was normal. (Tr. 388).

On July 23, 2013, Dr. Burger noted the results of the above studies. He prescribed wrist splints and Relafen, as well as continued physical therapy for his back. (Tr. 378).

Dr. Burger sent copies of his office notes to Dr. Robert Farmer in New Baden, Illinois. Dr. Farmer is listed as plaintiff's primary care physician on some records, e. g., Tr. 423, but there are no office notes reflecting treatment by Dr. Farmer.

The agency requested that Dr. Farmer examine plaintiff and submit a report. Dr. Farmer examined him on January 21, 2014, and submitted a report in March 2014. Dr. Farmer noted a prior history of arthroscopic surgery on the left knee and surgery on the right knee for arthritis. Plaintiff said he had persistent swelling in his left knee. He had surgery on the right shoulder for arthritis, prior bilateral carpal tunnel surgery, multiple left wrist fractures in the past, and a history of back issues since at least 2010. On exam, he had mild bilateral edema in the (unspecified) extremities. He walked with a slightly antalgic gait. Grip strength was decreased (4/5) in both hands. There was pain with palpation of the left lumbosacral paraspinous muscles and mild lumbosacral muscle spasm. He had crepitus in both knees with extension and flexion. Straight leg raising was negative. Dr. Farmer stated, "Given his collective set of symptoms it is quite

apparent to me that it is difficult for him to engage in physical endeavors." (Tr. 444-449).

Dr. Vittal Chapa performed a consultative physical exam at the request of the agency on January 30, 2014. Plaintiff's weight was 307 pounds. He had a cane with him, but he was able to ambulate for up to 50 feet on a flat surface without the cane. There was no edema of the lower extremities. Motor examination showed no specific motor weakness or muscle atrophy. He was able to appreciate pinprick to both lower extremities. There was no significant tremor. Handgrip was full bilaterally. He was able to perform fine and gross manipulations with both hands. Straight leg raising was negative up to 75 degrees. He had a full range of motion of all joints, including both knees. Range of motion of the lumbar spine was reduced. (Tr. 437-441).

Dr. Farmer prescribed hydrocodone-acetaminophen for plaintiff in April and June 2014. There are no notes reflecting office visits on those dates. (Tr. 451-455).

Plaintiff began seeing Dr. Lowell Sensintaffar in August 2014. He was seen about every 6 months for follow-up of his diabetes, hypertension, and other complaints. He complained of trigger thumbs at the first visit and was referred to sports medicine. Exam at the first visit showed trace edema in the extremities. Gait and station were normal. In October 2014, an alternate insulin injection mechanism was recommended because his tremors, hand spasms, and needle phobia made it difficult for him to use standard insulin needles. Further, he had been taking Vicodin for "quite some time" and Dr. Farmer had told him that he

would have to see a pain clinic. Dr. Sensintaffar referred him to a pain clinic and gave him a prescription for Vicodin as a bridge. Exam showed normal gait and station. In April 2015, Dr. Sensintaffar noted pain management was "handling his narcotics" and Relafen was "currently managing his day-to-day pain fairly well." He said his tremor was getting worse and he needed a referral to see his neurologist. On exam, he had no lower extremity edema, gait was normal, and movement of the extremities was normal. Exam was the same in July 2015. In August 2015, plaintiff asked Dr. Sensintaffar to complete a crossbow application for the Illinois Department of Fish and Game because his hand arthritis and spasms along with his left shoulder pain hampered his ability to operate a compound bow. On exam, he had no lower extremity edema, gait was normal, and movement of the extremities was normal. (Tr. 493-542).

In August 2015, Dr. Burger, the neurologist, noted that the increased dosage of Primidone was controlling his head titubation, but he continued to have occasional appendicular tremor particularly when he was tired or fatigued. On exam, he had normal strength, bulk, and tone bilaterally throughout. He had a fine tremor intermittently with sustained posture or fine articulate activity with the upper limbs, but it dissipated with rest. Sensory examination was intact to light touch and pinprick. Gait and Romberg testing were normal. Dr. Burger increased the dosage of Primidone again. Plaintiff was to return in one year. (Tr. 615-616).

Plaintiff returned to Dr. Sensintaffar on September 9, 2015. He had been evaluated by "occupational therapy" for his crossbow license application. He said

they found "some disability." That report is not included in Dr. Sensintaffar's records. Plaintiff also had a disability form from his lawyer to be filled out. Exam showed decreased grip strength bilaterally and fine resting tremor, along with normal gait and station. Dr. Sensintaffar noted that the form from the lawyer mostly pertained to "ADLs which are essentially history as opposed to exam findings." The doctor asked plaintiff to take the form home and "honestly" complete it and then book another appointment so they could go over it together. (Tr. 552-556).

Dr. Sensintaffar completed a checkbox form entitled "Medical Source Statement" on September 30, 2015. He indicated that plaintiff had symptoms including difficulty walking, swelling, general malaise, muscle weakness, extremity pain and numbness, dizziness/loss of balance, and tremors. For "clinical findings," he wrote "tremors, hand weakness, chronic LBP." He indicated that plaintiff could walk for 1 or 2 city blocks, sit for 2 hours at a time, and stand for 1 hour at a time. He could sit for a total of 2 hours a day and stand/walk for a total of less than 2 hours a day. If he had a sedentary job, plaintiff would be required to elevate his feet above the waist for 2 to 3 hours during the work day. The most weight he could lift was less than 10 pounds, and only rarely. He could never twist, stoop, crouch, squat, or climb ladders, and could rarely climb stairs. He could use his hands and fingers and reach for 20% or less of the work day. He would be off task for 25% or more of the time, and would be likely to miss work more four days per month. (Tr. 543-546).

In October 2015, a nurse practitioner at the pain management clinic noted

that plaintiff's chronic pain was stable. (Tr. 573).

In December 2015, plaintiff told Dr. Sensintaffar that pain management had recently switched him to oxycodone acetaminophen. His neurologist had increased the medication for his tremors. On exam, there was no edema in the extremities. Gait and station were normal. (Tr. 558-563).

In January 2016, the nurse practitioner at the pain management clinic noted that plaintiff denied any progressing pain or instability. He was taking Percocet in the morning and occasionally an afternoon dose when he was very active. She stated he was able to do employment duties, social outings, shopping, cooking, and personal hygiene due to his current treatment regimen. On exam, there was no edema in the extremities and he ambulated with a normal gait with no assistive device. (Tr. 568-570).

## **Analysis**

Plaintiff argues that the ALJ erred in weighing the opinions of Drs. Farmer and Sensintaffar.

The ALJ gave little weight to Dr. Farmer's opinion because his statement that it was difficult for plaintiff to engage in physical endeavors was vague and conclusory, his opinion was based on one exam, and his findings on exam were not consistent with the multiple other exams noting near normal findings. He gave little weight to Dr. Sensintaffar's opinion because it was not well supported or consistent with the record. It was not well supported because Dr. Sensintaffar did not explain how the impairments or his findings supported the limitations he identified. It was not consistent with the other medical evidence in the record,

including the normal MRI and the "many normal or only mildly abnormal physical and neurological exams." (Tr. 18-19).

Obviously, the ALJ was not required to credit either of the opinions even though they were offered by treating doctors; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

The ALJ is required to consider a number of factors in deciding how much weight to give to a treating doctor's opinion. The regulations refer to a treating healthcare provider as a "treating source." The applicable regulation, 20 C.F.R. § 404.1527(c)(2), provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

If the ALJ decides not to give the opinion controlling weight, he is to weigh it applying the factors set forth in § 404.1527(c)(1)-(6). Supportability and

consistency are two important factors to be considered in weighing medical opinions. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).

Plaintiff argues that the ALJ was incorrect in stating that Dr. Farmer's opinion was based on only one exam because the record demonstrates that Dr. Farmer "had a long-standing treatment relationship" with plaintiff. Doc. 12, p. 8.

While the record suggests that Dr. Farmer was listed as plaintiff's primary care physician in 2012 and 2013, and some other treaters sent copies of their notes to Dr. Farmer, there are no notes reflecting any treatment by Dr. Farmer before he examined plaintiff in March 2014. The ALJ's statement that Dr. Farmer's opinion was based on only one exam was therefore an accurate statement based on the evidence in the record.

More importantly, plaintiff's argument ignores the rest of the ALJ's reasons for discounting Dr. Farmer's opinion: Dr. Farmer's findings on that one exam were contradicted by the findings on "multiple" other exams. The ALJ identified those other exams by exhibit and page number. See, Tr. 18. Those other exams include exams by Drs. Burger, Chapa, and Sensintaffar, as well as the nurse practitioner at the pain management clinic.

As to Dr. Sensintaffar, plaintiff argues only that Dr. Sensintaffar saw plaintiff 6 times and that his opinion was consistent with Dr. Farmer's opinion.

14

Again, plaintiff ignores the ALJ's reliance on the many normal exams documented in the record, including exams by Dr. Sensintaffar himself, as well as the normal lumbar MRI. The fact that his opinion was consistent with Dr. Farmer's offers little support in light of the ALJ's accurate conclusion that both opinions were contradicted by the rest of the medical evidence. Notably, in office exams both before and after the date he filled out the report, Dr. Sensintaffar found that plaintiff had no lower extremity edema, his gait was normal, and the movement of his extremities was normal. (Tr. 493-542, 558-563).

There are glaring discrepancies between Dr. Sensintaffar's opinion and his own treatment notes. For instance, he said that plaintiff needed to use a cane or other assistive device for walking or standing, but he repeatedly found that plaintiff had normal gait, station, and movement of the extremities, and his treatment notes never mention an assistive device. He said that plaintiff should elevate his feet while sitting, but, aside from a single note of trace edema, he found no swelling of the extremities. Further, Dr. Sensintaffar recognized that the disability form mostly concerned "ADLs which are essentially history as opposed to exam findings." He asked plaintiff to take the form home and "honestly" complete it, suggesting that Dr. Sensintaffar's opinion was largely based on plaintiff's own answers. (Tr. 552-556). An ALJ may discount a treating doctor's opinion that is based on plaintiff's subjective complaints. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

In light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard

which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The Court finds that ALJ Mein easily met the minimal articulation standard here.

Plaintiff's second point is that the ALJ failed to recontact his treating medical provider as required by 20 C.F.R. § 404.1512(e). He does not specify which provider the ALJ should have recontacted. This point can be swiftly disposed of.

First, § 404.1512 was revised in 2012 to eliminate the subsection (e) requirement that the ALJ recontact a treating source. See, 77 FR 10651-01, 2011 WL 7404303. The version of § 404.1512 in effect at the time of the ALJ's decision contained no such requirement. Even under the old version of § 404.1512, the ALJ was required to recontact a treating provider only where the ALJ determined that the record was insufficient to make a decision. The ALJ made no such determination here. Lastly, plaintiff was represented by counsel before the agency, and the ALJ could therefore presume that he had presented his best case for benefits. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007).

This is not a case in which the ALJ failed to discuss evidence favorable to the plaintiff or misconstrued the medical evidence. Rather, after reviewing the evidence in detail, the ALJ concluded that the opinions of Drs. Farmer and Sensintaffar were not well supported and were contradicted by the rest of the medical evidence, including Dr. Sensintaffar's own treatment notes. Plaintiff has not identified a sufficient reason to overturn that conclusion.

Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by

substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d at 413.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Mein committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED.**

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:** August 24, 2018.

s/Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**